LUELLA AUMACK et al.

*v.*

W. SCOTT JACKSON et al.

[Decided January 16th, 1911.]

1. Admissions are generally regarded as somewhat unsatisfactory evidence.

2. Testimony of a party to an action against an executor as to statements made by decedent is inadmissible.

3. Evidence in an action to establish a parol trust upon property given by will to decedent's wife *held* to show that because of his mental and physical incapacity, decedent's wife induced him to give the property to her for life, and promised to leave it at her death to decedent's relatives, to whom he had intended it should go.

4. Since a devise of property to testator's wife to hold for life on her promise to leave it to testator's relatives on her death, as testator had intended, constituted a legal trust, being defective only in that the proportion of the distributive shares of testator's relatives were not designated, the wife will take the property as trustee for testator's next of kin, to be divided according to the statute of distribution.

5. In an action to establish a constructive trust in property left to testator's wife under a promise by her to leave it to testator's rela-

tives at her death, but which she left to others, evidence *held* to show that defendant unduly influenced testator's wife to leave the property to him contrary to her promise to her husband.

6. The executor and legatee of one to whom property was given by will in trust to be left to testator's relatives, and who induced such trustee to leave the property to himself instead of to testator's relatives, stands in no better position than such devisee, and holds the property as trustee for such relatives.

7. Where testator left his property to his wife under a parol understanding that at her death she should leave it to his relatives as he had originally intended doing, so as to make her the trustee of the property for such relatives, it cannot be held that the wife took one-half of such property as a childless widow under the statute of distribution, so as to permit her next of kin to inherit such half, especially as to one of her next of kin who wrongfully induced her to leave the property to him contrary to testator's understanding and wish; equity not permitting one to gain an advantage from his own wrong.

On final hearing on pleadings and proofs.

*Mr. Aaron E. Johnston* and *Mr. Edmund Wilson,* for the complainants.

*Mr. Isaac W. Carmichael, Mr. Halsted H. Wainright* and *Mr. William H. Corbin,* for the defendant W. Scott Jackson.

*Mr. Foster M. Voorhees,* for the defendant Bella Drake.

WALKER, V. C.

The bill is filed by the heirs-at-law of Selah Aumack, deceased, late of Toms River, in the county of Ocean, to impress a parol trust upon the estate which he devised and bequeathed to his wife, who died after he died, leaving a last will and testament in which she gave small legacies to four nieces of her deceased husband, left a considerable legacy to her sister, and gave the rest and residue of the property, comprising the bulk of the estate, to her brother, W. Scott Jackson, whom she appointed sole executor of her will.

The facts are these: Selah Aumack, who was a thrifty man, accumulated a fortune of something over one hundred thousand dollars. He had a stroke of apoplexy in the month of January,

1905, from which, however, he substantially recovered and lived until September 21st of that year, when he died. His mind, though probably weakened, was, doubtless, not seriously impaired. Between his first stroke of apoplexy and the second one, from which he died, his physique, at times at least, was not what it had formerly been, and to a certain extent he lacked bodily vigor. Before he was stricken in January, 1905, so far as appears, he had never made any will. In April or May of 1905 he considered the making of a will, but complained to his wife that the undertaking distressed him and made his head hurt. His wife, Louise Aumack, then suggested that he make a will giving all his property to her for life, saying that she would make a will dividing it among his heirs, as she understood he desired his property should go. The proof of this lies partly in the testimony of Mrs. Corinne A. Holmes, one of the nieces of Mr. Aumack, and who is one of the complainants, and whose testimony was taken subject to objection. She recounts a conversation between her uncle and his wife, in her presence, in the spring of the year 1905, from which it may be inferred that the agreement claimed to have been made was made, although, standing alone, this testimony would not establish it. Disregarding the testimony of Mrs. Holmes entirely, there is proof of a trust which lies principally in admissions made by Mrs. Aumack. I know that admissions are generally regarded as somewhat unsatisfactory, but in this case they are so clearly and overwhelmingly established as to carry conviction to the mind and are sufficiently certain to leave no doubt of the trust they operate to establish.

Mrs. Ann Griffiths, an intimate friend of Mr. and Mrs. Aumack, had a conversation with Mrs. Aumack, not long after Mr. Aumack's death, in which Mrs. Aumack said that she supposed Mrs. Griffiths was surprised to know that she had received the whole of the estate, because her husband had told her they had had an understanding that it was all to go to his relatives, that he was going to leave a will, but his head troubled him so that she said to him, never mind, just leave it to her and she would do what he wanted; and concluded by saying she was going to leave it as he wanted it. Later on, when calling upon Mrs. Aumack, who was considerable of an invalid, the witness jokingly said that

she wished Mrs. Aumack had left the house to her; whereupon Mrs. Aumack, with tears in her eyes, asked her how she could say that, knowing that she had made the promise to her husband, that he had trusted her, and she must keep the promise.

Mrs. Augusta M. Havens, another witness, who was a neighbor of the Aumacks and intimate with the family, on December 5th, 1907, hearing that Mrs. Aumack was very ill, called at the house. Mrs. Aumack, who had been quite feeble for a long time, was lying on a couch. In the course of the conversation Mrs. Aumack remarked that her husband had said to her he did not know how to make his will, there were so many of them (his relatives), and she had said to him, well, you leave that to me, and she further said she did not know whether she had done right or not; she thought he (her husband) would outlive her.

Leola Clayton, a remarkable young woman and whose testimony bore the impress of absolute truth, who was housekeeper for Mrs. Aumack from June 20th, 1907, until her death, on January 4th, 1908, was present on the occasion of Mrs. Havens's visit on December 5th, 1907, and heard the conversation between them, Mrs. Aumack lying on the couch. She heard her telling Mrs. Havens that her husband was going to leave a will and leave his money to his relatives, and he said he did not know how to make it, there were so many of them; and that she (Mrs. Aumack) said to leave it to her and she would do it for him, and he did, and she did not know whether she had done right or not; she thought that he would outlive her.

Mrs. Cora Brooks, an intimate friend of both the Aumacks, describes a conversation with Mrs. Aumack during a call at her house in August, 1907, in which Mrs. Aumack said to her that her husband intended to leave a will, and leave his estate so that after his death it would go to his relatives in different amounts, the larger amount to the family of his brother Elijah; and further said that her husband started to make a will a short time after his first stroke, but said that he had so many relatives that it hurt his head to think about them all; and that she (Mrs. Aumack) said that she told him not to bother about his affairs but just to make a short will, leaving everything to her, and she would make a will

and fix it for his relatives just as she knew he wished to have it; and that he left it to her in that way.

Mrs. Annie Bennett, while at the Aumack house two or three years before Mr. Aumack was first stricken, heard him say, in the presence of his wife, that he was going to make a will and leave everything to his wife, and that after her death, his sister (Mrs. Bond) and his nephews, or his brother's children (John and Frank), would get a nice present, and the bulk of his money would go to Elijah's family, and she (Mrs. Aumack) said yes, that was Selah's will and the way he was going to make it.

Mr. Aumack's feeling toward his brother-in-law, W. Scott Jackson, the defendant, as disclosed by the testimony, seemed to be one of dislike and distrust.

The testimony of the witnesses adverted to, with the exception of that of Mrs. Holmes, which will be disregarded because she is a party and the defendant Jackson is sued in a representative capacity (which prevents her repeating statements made by Mrs. Aumack), was by disinterested friends of the deceased persons (Mr. and Mrs. Aumack), and in one instance by the housekeeper, none of whom had any bias or interest whatever in the case.

The testimony, succinctly detailed above, leaves upon my mind the indelible impression that Selah Aumack intended to leave his estate to his own blood relatives, and that his wife, in whom he had supreme confidence, dissuaded him from that purpose, or, rather, act, on account of his mental and physical indisposition to engage in it, and requested him to make a will in her favor, leaving her all of his property for her life, and promising, at her death, to leave it to his relatives, as he had intended; she to substitute her discretion for his in the manner of its distribution, *i. e.,* the proportion which should go to each of his nephews and nieces. In the one particular that he had never charged upon her the exact proportions of the disposition and distribution of his property, was there no certainty in the terms of the trust confided to Mrs. Aumack, but that, as will appear, was not necessary to sustain the trust; in other words, uncertainty in that regard will not work its defeat.

In *Ramsdell* v. *Streeter, 62 N. J. Eq. (17 Dick.) 718,* a case in which a will was attacked upon the ground that the testatrix

gave the residue of her estate to the defendant to carry out certain purposes upon which they had agreed, Vice-Ordinary Reed said (at *p. 719*) :

"It is not sufficient that it should appear that testatrix intended that the property should be devoted by the legatee to purposes other than his personal use. Unless he induced this disposition by expressly or impliedly assenting to the expressed purposes of the testatrix, it would not affect the gift at all.

"Nor if he did so induce the testatrix would it avoid the will, for if the purposes were legal and ascertainable, he would be compelled to execute the trust (*Vreeland et al., Executors,* v. *Sarah A. Williams et al., 32 N. J. Eq. (5 Stew.) 734*), and if they were illegal or unascertainable, he would be held to be a trustee for the heirs or next of kin. *2 Underh. Wills 220; In re Boyes, L. R. 26 Ch. Div. 531.* It must further appear that he fraudulently procured the execution of the instrument by unduly influencing her to make her will to accomplish these purposes."

Now, applying the doctrine enunciated in *Ramsdell* v. *Streeter* to this case, the purpose of the trust here being legal, but unascertainable as to proportions of distributive shares, the legatee will be held to be a trustee for the next of kin of the testator.

The law reaches a case like this. *Williams* v. *Vreeland, 32 N. J. Eq. (5 Stew.) 734,* is, in my judgment, a controlling authority for the complainants in this cause, and is the only case which I will cite on this head. The statement of facts in that case (*Williams* v. *Vreeland*), with which Mr. Justice Van Syckel prefaces the opinion of the court of errors and appeals, shows a situation very like that in the case in hand. It is as follows (*32 N. J. Eq. (5 Stew.) 735*) :

"Henry Frost, by his will, bequeathed to his nephew, Cornelius C. Vreeland, the sum of $30,000. The complainants, who are children of Eliza Saunier (the legatee's sister), allege that, although no trust is declared in the will, $10,000 of this sum was given to the said Vreeland in trust for them, and on a parol promise, on his part, to the testator, that, if the latter would give him a legacy of $30,000, he would pay over $10,000 of it to the complainants. The bill is filed against the executors of the legatee, who has since died, to enforce this alleged trust."

And on *p. 736*, Mr. Justice Van Syckel, quoting from *Story Eq. Jur.*, puts the rule which appositely applies to the case at bar:

"Thus, if a man, in confidence of the parol promise of another to perform the intended act, should omit to make certain provisions, gifts or arrangements, by will or otherwise, such a promise would be specifically enforced in equity against such promisee, although founded on a parol declaration creating a trust contrary to the statute of frauds, for it would be a fraud upon all the other parties to permit him to derive a benefit from his own breach of duty and obligation."

And at *p. 737:*

"This case must be classified with trusts which arise *ex maleficio,* and in which a court of equity, in order to reach the fraudulent procurer of what, in conscience, belongs to another, turns him into a trustee."

The fraud in this case proceeds a step further than Mrs. Aumack, and I doubt very much if she, left to her own conscience as a guide, would have made a breach of the trust imposed upon her by her husband and accepted by her, or, rather, sought by her from her husband. The ultimate fraud-doer was her brother, the defendant W. Scott Jackson, who coerced her, when in the extreme discomfort of bodily and mental weakness, and when she was practically a dying woman, to make her will principally in his favor, in which will she bequeathed almost the entire estate of her husband to him and her sister, and diverted it away from the family and natural objects of Mr. Aumack's bounty.

Mrs. Aumack's will was made on Saturday, December 7th, 1907. The day before Mr. Jackson went to the house and asked Miss Clayton how Mrs. Aumack was, to which Miss Clayton replied that she was "very bad." Mr. Jackson said he did not think she was going to live long and asked her if she did, and Miss Clayton said no, and something must be done, for she, Miss Clayton, would not stay alone; and he said he would see about a nurse, and asked Miss Clayton if she had heard Mrs. Aumack say anything about making a will, and she told him "no," only from what she said to Mrs. Havens the afternoon before; and she informed him that Mrs. Aumack had told Mrs. Havens that Mr.

Aumack said he was going to make his will and leave his money
to his relatives, and said he did not know how to make it, there
were so many of them, and that she, Mrs. Aumack, said leave it to
her and she would do it for him, and he did, and she did not know
whether she had done right or not; she thought he would outlive
her; whereupon Mr. Jackson said there were a lot of relatives
who would come in, and if she had anything for him, he wanted
it, and he said, "she has got to make a will." That afternoon Mr.
Jackson went to the house again to see his sister and went in
where she was and closed the door, and was there about an hour
and a quarter, and after he had gone Miss Clayton went into the
room and found Mrs. Aumack very nervous and worried. The
next day, in the morning, Mr. Jackson told Miss Clayton that
Judge Martin would call at the house at one o'clock and they were
going to do some business, requesting her to go to the door when
Judge Martin arrived. When the judge called and Miss Clayton
announced him to Mrs. Aumack, she said, "What does he want,
I don't want to see him." He was, however, admitted. Miss
Clayton passed through into the kitchen where Mr. Jackson was,
and he said to her: "She don't want to do it, she don't want to
make a will, but if she will only sign it will be all right, and I
think she will." Mrs. Aumack was lying on a couch in the sitting-
room and it was possible to see from the kitchen into the room
occupied by her and Judge Martin. The judge was sitting there
reading a paper, and while this was going on Miss Clayton took
Mrs. Aumack an egg-nog, and then left the house on an errand,
and met Dr. Austin and Edward Camburn entering; they were
the witnesses to the will. Mr. Camburn was sworn, and it appears
that he was summoned by Mr. Jackson, a thing harmless in itself,
but considered, with all the other facts, it is a somewhat signifi-
cant circumstance.

In Judge Martin's testimony it is shown that Mr. Jackson
brought him the memorandum in his own handwriting, from
which the will was prepared, and he testified that Mrs. Aumack
told him she had talked with Mr. Jackson about the preparation
of the will; and he says that Mr. Jackson was still in the house
after the will had been executed. Nor is this all: Immediately
after the will was executed, Mrs. Copperthwaite, a neighbor and

intimate friend, called on Mrs. Aumack. She found her feeble and agitated. Mrs. Aumack said to her, "There have been some men here this afternoon and I don't want them;" and Mrs. Copperthwaite replied that if she hadn't wanted them she would not have had them; and Mrs. Aumack said, "I had to, Scott made me." That evening, about six o'clock, Edith Richmond, a trained nurse, who had been employed, reached the house. She found Mrs. Aumack still upon the couch and very miserable. Mrs. Aumack said to her: "I have been through a dreadful ordeal to-day; I have done something and I am very sorry, and I wish I had not done it."

Another significant fact is this: After the making of the will, Mr. Jackson wanted to keep Mrs. Aumack's pastor and the children of her husband's brother Elijah away from the house, and told the nurse that he did not want them to come there; that it would not be good for the patient. He said to Miss Clayton that there was no sense in letting the girls upstairs, that he did not want them there. The reason for this conduct on his part is perfectly obvious; he did not want the testatrix to fall under the influence of her pastor or her husband's relatives lest they might control her to his undoing.

To my mind it clearly appears that W. Scott Jackson induced and controlled the making of this will, and but for his nefarious interference it never would have been made. I cannot be persuaded that Mrs. Aumack, in her anæmic and dying condition would have sent for anybody to draw her will leaving her husband's property to her relatives instead of to his, as she had promised. Whether the bequest to Mrs. Drake and the Aumacks was a device of Mr. Jackson's to throw off suspicion, or whether Mrs. Aumack insisted upon that much herself, I do not know, but believe Mr. Jackson controlled it. It was not unnatural for him to desire that his sister should receive some of her sister's bounty. The bequests to the Aumacks were inconsiderable; and doubtless were permitted to give the transaction a color that was unreal, and in the hope that it would ward off an attack upon the will.

I have not overlooked the evidence on the other side. True it is that Mr. Aumack said to Miss Fisher, the scrivener who drew his will, that he had never made a will because he did not know

how to leave his property, and he guessed he would leave it all to his wife and she could do what she pleased with it, that she helped earn it.   He made declarations of similar import to several other witnesses.   These assertions are not inconsistent with the arrangement made between him and his wife, and if they are they do not control the situation.   I can understand that he would not disclose to Miss Fisher and to his somewhat mysterious friend Potter, and to Gaskill and to Cranmer, what his real intentions were ; although he might have talked to them with more or less freedom about the making of a will, and even pretended to have sought advice from them.   I repeat that the statements that these witnesses testified to do not contradict the facts which go to establish the trust, except by way of inference and argument, and the inference is not strong enough, and the argument not deep enough to change the situation.   If the trust be once established, and I think it is, it would be singular indeed if it could be overthrown on such testimony as this.

But, after all, finding the trust established, it must be fastened upon Mr. Jackson as Mrs. Aumack's executor or legatee, or both, for he can stand in no better situation with reference to the property than she did, and as it was not hers to bestow, it could not be his to receive, and I hesitate the less to deprive him of it when I believe, as I do, that he procured it only by the exercise of coercion and undue influence.

As the will of Mrs. Aumack was impotent to devolve the estate upon Mr. Jackson and the other legatees, and as she must be treated as having held it as trustee for the next of kin of her deceased husband, that estate must now be divided between them, according to the statute of distribution.   *Ramsdell* v. *Streeter*, *ubi supra*.

The defendant Mr. Jackson contends that if this view of the case be adopted, it must be held that Mrs. Aumack took her share, one-half, as a childless widow, under the statute of distribution in force at the time of Mr. Aumack's death.   This cannot be admitted for an instant.   Finding that Mrs. Aumack procured the property upon an express promise to bestow it upon the next of kin of Mr. Aumack, equity and good conscience required that it be so bestowed by the court, which must substitute its conscience

for the conscience that Mrs. Aumack should have exercised, and that therefore none of her next of kin are entitled to inherit property which passed out of her upon her death, and this is especially true with reference to Mr. Jackson, whose participation in the property, under the circumstances disclosed in this case, would be but gaining an advantage from his own wrong, a thing prohibited by a positive maxim of equity.

The complainants are entitled to a decree in accordance with the views above expressed. The defendant W. Scott Jackson will be visited with the costs.